## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| AMY LEE NUHFER, | ) | CASE NO. 3:16CV1294 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Amy Lee Nuhfer ("Plaintiff"), challenges the final decision of Defendant,

Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying her

applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. §

405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons

set forth below, the Magistrate Judge recommends that the Commissioner's final decision be

AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.   PROCEDURAL HISTORY

In August 2012, Plaintiff filed applications for POD, DIB, and SSI, alleging a disability onset date of January 1, 2009, and claiming she was disabled due to bipolar disorder, fibromyalgia, and an unstable gait.  (Transcript ("Tr.") 54).  The applications were denied initially and upon reconsideration, and she requested a hearing before an administrative law judge ("ALJ").  (Tr. 134).

On June 23, 2014, an ALJ held a hearing, during which Plaintiff, represented by counsel, and an impartial vocational expert ("VE"), testified.  (Tr. 32-53).  On November 19, 2014, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 10-29).  The ALJ's decision became final on March 30, 2016, when the Appeals Council declined further review. (Tr. 1-4).

On May 27, 2016, Plaintiff filed her complaint challenging the Commissioner's final decision.  (Doc. No. 1).  The parties have completed briefing in this case.  (Doc. Nos. 10, 11, 12). Plaintiff asserts the following assignment of error:

> Whether the administrative law judge erred in his evaluation of the opinion of Mr. Woods, [Plaintiff's] treating counselor, where he failed to consider the record as a whole in his evaluation of this opinion, citing only to the evidence that supported his analysis without regard to the longitudinal aspects of the treatment and medication side effects.

(Doc. No. 10).

# II.   EVIDENCE

## A.    Personal and Vocational Evidence

Plaintiff was born in 1977 and was 37 years old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 23).  *See* 20 C.F.R. §§

2

404.1563(c) & 416.963(c).  She has a high school equivilency and is able to communicate in

English.  *Id.*  She has past relevant work as a food service manager.  (Tr. 22-23).

**B.      Medical Evidence**

On July 18, 2011, Plaintiff presented to Louise Schira, PCC at Harbor Behavioral

Healthcare for an initial mental health assessment.  (Tr. 408).  Plaintiff reported that her mood

fluctuated "between rushing nonstop to get everything done" and "losing momentum and falling

back into a sad and lethargic state."  *Id.*  She indicated that years earlier, after being hospitalized

for mental health issues, she had been prescribed Depakote and Ativan for bipolar disorder and

anxiety, respectively, which she had discontinued six months later.  (Tr. 409).  Plaintiff wished

to restart medication, and she requested counseling.  (Tr. 410).  A mental status exam revealed

cooperative behavior, anxious mood, appropriate thought content, scattered thought process,

normal speech, slowed motor activity, average intellect, normal judgment, and impaired

memory.  (Tr. 410-11).  Plaintiff was diagnosed with bipolar disorder NOS, and she was

assigned a GAF score of 48.[2]  (Tr. 411).

On August 30, 2011, Plaintiff presented to David Bingham, a certified nurse specialist

("CNS"), who performed a 60-minute psychiatric evaluation.  Plaintiff reported symptoms of

---

[2]      The GAF scale reports a clinician's assessment of an individual's overall level of
functioning.  An individual's GAF is rated between 0-100, with lower numbers
indicating more severe mental impairments.  A GAF score between 41 and 50
indicates serious symptoms or any serious impairment in social, occupational or
school functioning.  A score between 51 and 60 indicates moderate symptoms or
moderate difficulty in social, occupational, or school functioning.  A recent
update of the DSM eliminated the GAF scale because of "its conceptual lack of
clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic
and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric
Ass'n, 5th ed., 2013).

3

impulsivity, obsessions, compulsions, and delusions of people staring at her.  (Tr. 457).  She noted a history of untreated bipolar disorder.  (Tr. 454).  She was diagnosed with bipolar I disorder, most recent episode manic, moderate, and she was assigned a GAF score of 60.  (Tr. 458).  Plaintiff was prescribed Lamictal, but, because of side effects, she later switched to Abilify and Ambien.  (Tr. 452-53).

On July 3, 2012, Plaintiff was seen by Lori Dewey, CNS, for a psychiatric evaluation. Plaintiff reported that she had stopped taking medication in October 2011 because she was caring for her four-year-old niece.  (Tr. 412).  Plaintiff denied hallucinations.  (Tr. 413-15).  A mental status exam showed cooperative behavior, euthymic and expansive mood, intact memory and concentration, logical and linear thought form, intact cognitive function, and good insight and judgment.  *Id.*  Plaintiff was restarted on Abilify.  (Tr. 416).  During a follow up on July 31, 2012, Plaintiff reported that Abilify aggravated her symptoms, and her dosage was adjusted.  (Tr. 466).  On August 28, 2012, Plaintiff reported constant racing thoughts, depression, mood instability, and irritability.  (Tr. 442).  She was started on Seroquel.  *Id.*

On December 20, 2012, Plaintiff presented to Mr. Bingham, complaining that Seroquel was causing hives and nausea.  (Tr. 438).  Seroquel was discontinued, and she started on Trileptal and Restoril.  (Tr. 439).

On January 2, 2013, Plaintiff presented to Michelle Prephan, R.N.  (Tr. 434).  She reported better mood, but she was still irritable, with racing thoughts and poor sleep.  *Id.*  Her dosage of Trileptal was increased, and she was continued on Restoril.  (Tr. 436).

On January 17, 2013, Plaintiff presented to Amy Clark, CNS, complaining of racing thoughts and difficulty sleeping.  (Tr. 430).  Plaintiff reported past instances of childhood sexual

abuse.  *Id.*  Ms. Clark prescibed Latuda for sleep.  (Tr. 432).  On January 31, 2013, Plaintiff told Ms. Clark that Latuda caused itching all over her body, even with daily use of Benadryl.  (Tr. 426).  Plaintiff also reported that while reading she would hear music in her head.  *Id.*  Ms. Clark prescribed Fanapt to control auditory hallucinations and diagnosed bipolar I disorder, most recent episode mixed, severe with psychotic features.  (Tr. 427-28).

On February 14, 2013, Plaintiff again presented to Ms. Clark.  (Tr. 422).  She reported doing well on Fanapt–her mood was stable; she was not irritable; and she was sleeping better than she had in years, but she was feeling groggy.  *Id.*  Ms. Clark advised her that her side effects would ease once her body adjusted to the new medication.  *Id.*  On February 28, 2013, Plaintiff reported doing well, feeling grogginess, and hearing music in her head.  (Tr. 418).  On March 28, 2013, Plaintiff told Ms. Clark she was doing well, noting that she had not noticed a difference in her mood until she missed a dose of medication.  (Tr. 579).  Plaintiff was still reportedly experiencing visual and auditory hallucinations, but she was sleeping well with the Restoril.  *Id.* Ms. Clark prescribed an increased dose of Fanapt.  (Tr. 581).

On April 26, 2013, Plaintiff told Ms. Clark that she was doing well, sleeping well, and her mood was mostly stable.  (Tr. 582).  She reported that the pharmacy did not provide her the increased dosage of Fanapt, as previously prescribed.  *Id.*  Plaintiff again reported auditory and visual hallucinations, and she was continued on an increased dosage of Fanapt.  (Tr. 583-84). On May 30, 2013, Plaintiff saw Ms. Clark and reported trouble falling asleep.  She noted an increased heart rate, which her primary care physician thought may have been causing her sleep issues and depression.  (Tr. 585).  There were no changes to treatment.  (Tr. 587).

On July 1, 2013, Plaintiff told Ms. Clark that she was still not sleeping well, and she was prescribed Baclofen.  (Tr. 588-90).  On August 1, 2013, Plaintiff reported improvement. (Tr. 591).  Plaintiff was reportedly compliant with her medication; her mood was stable; and she had no racing thoughts.  *Id.*  On October 21, 2013, Plaintiff again reported a stable mood, but she was a little depressed.  (Tr. 595).  She attributed her difficulty sleeping to the pain that she was having in connection with gastrointestinal problems.  *Id.*

In May 2014, Plaintiff saw Ms. Clark and reported that she had discontinued her medications after her last visit in October 2013 due to abdominal pains.  (Tr. 698).  Plaintiff asked to restart a mood stabilizer due to variable depression, and she reported continued auditory hallucinations.  She stated that she was sleeping well; that she had been dating a man for six months; that she was in a wonderful relationship; and that she stayed with her boyfriend most of the time.  (Tr. 698).  A mental status exam showed alertness, pleasant behavior, euthymic mood, normal thought content, logical thought process, no thought or perception disturbances, average intellect, fair judgment, and intact long-term and short-term memory.  (Tr. 698-700).  Her GAF score remained at 60.  (Tr. 580, 583, 586, 589, 592, 596, 699).  Ms. Clark started Plaintiff on Risperdal and Vistaril.  (Tr. 700).

In January 2013, Plaintiff established care with counselor Richard Woods, PCC, and, over the course of 2013, she saw him five times. (Tr. 464).  On February 1, 2013, Mr. Woods reported "some improvement" in her progress toward her goals (Tr. 462), but, in March 5, 2013, her progress had reportedly "deteriorated."  (Tr. 460).  On March 26, there was no change.  (Tr. 567).  In May 2013, Plaintiff told Mr. Woods she was sleeping better, but not for the full night, and Mr. Woods noted "some improvement" toward her goals.  (Tr. 569).

6

On June 17, 2013, Plaintiff established care with another counselor, Karen Fritts.  (Tr. 571).  Plaintiff told Ms. Fritts "she didn't connect with her first therapist [Mr. Woods] and requested a female counselor."  (Tr. 571).  On July 1, 2013, Ms. Fritts noted no change in Plaintiff's progress toward her goals, and that she continued to lack insight and understanding into her thoughts and behaviors.  (Tr. 573).  On August 20, 2013, some improvement toward her goals was reported.  (Tr. 575).

On April 28, 2014, Plaintiff returned to Mr. Woods for counseling. (Tr. 697).  He noted the session was "the first time in a long time."  *Id.*  Plaintiff reported continued problems with sleep and anxiety, as well as stomach pains that felt like contractions.  *Id.*  They reportedly talked about Plaintiff's "potential for work and decided it is not going to happen," until she dealt with the things that were bothering her.  *Id.*  They had another session in May 2014, and Mr. Woods noted that Plaintiff was anxious about her upcoming disability hearing; that she stopped doing her deep-breathing exercises; and that she had deteriorated in her progress toward her goal.  (Tr. 701-02).

## C.    Opinion Evidence

In October 2012, Mark Hammerly, Ph.D., performed a consultative psychological evaluation at the State Agency's request.  (Tr. 372).  Plaintiff reported feelings of hopelessness, guilt, worthlessness, and helplessness.  (Tr. 375-76).  She told Dr. Hammerly that she cared for her sick aunt, herself, and her children.  (Tr. 375).  On mental status examination, Dr. Hammerly noted that while Plaintiff seemed downcast, she "related in a businesslike and calm manner," showing no sense of irritability or other manic traits, no signs of anxiety, and no evidence of hallucinations, paranoia, or delusions during the interview.  (Tr. 376).  Dr. Hammerly

7

determined that Plaintiff's academic knowledge was borderline or low average, and her mental control, concentration, and memory were grossly intact.  (Tr. 376-77).

Dr. Hammerly diagnosed Plaintiff with mood disorder NOS, and assessed a GAF score of 57.  (Tr. 377).  Plaintiff's prognosis was rated good to fair.  It was noted that Plaintiff was obviously depressed, which might result in some difficulty starting a new job and would result in some difficulty readjusting to a work setting, and that Plaintiff might respond with somewhat decreased effectiveness when subjected to ordinary workplace pressures.  (Tr. 378-80).  Dr. Hammerly concluded that Plaintiff "should be able to understand and apply instructions in an employment setting at a mostly average level."  (Tr. 379).

In November 2012, State Agency reviewer Kristen Haskins, Psy.D., opined that Plaintiff had a moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  (Tr. 58).  Plaintiff could perform one-to-four-step simple, routine tasks in a low-stress setting that does not require close sustained focus/attention or sustained fast pace, and where changes are well explained. Plaintiff could occasionally and superficially interact with others, including the general public.  (Tr. 62-63).

In March 2013, State Agency reviewer Bruce Goldsmith, Ph.D., conducted an assessment and reported that Plaintiff had a mild restriction in activities of daily living.  (Tr. 85).  All of Dr. Goldsmith's other opinions matched those of Dr. Haskins.  (Tr. 85, 89-90).

On April 28, 2014, Counselor Richard Woods filled out the Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairments.  (Tr. 694-96).  Mr. Woods opined that Plaintiff would be able to remember, understand, and follow instructions for

simple tasks all of the time; that Plaintiff would be able to stay on task less than two-thirds of the time due to racing thoughts and anxiety interfering with her attention; that Plaintiff is unable to perform an average-paced job without a reduction in productivity of greater than 20% than an unimpaired worker, due to the fact that Plaintiff cannot stay in one spot for an extended time and has a racing mind; and that Plaintiff would likely be absent, late, or leave early from one to three times per month on a regular basis, based on the fact that Plaintiff had missed five of her fourteen scheduled appointments.  (Tr. 694-95).  Mr. Woods further opined that Plaintiff would be unable to consistently interact in a manner that is appropriate to customer or employer expectations, and would not be successful in  working with the public, co-workers, or supervisors due to her anxiety and tendency toward anger.  (Tr. 695).  Mr. Woods opined that Plaintiff could tolerate the stress of a routine, unskilled or low-skilled if she could take unscheduled absences or breaks as much as 15-20% of the workday.  (Tr. 696).

**D.    Hearing Testimony**

During the June 23, 2014 hearing, Plaintiff testified to the following:

- Plaintiff had a driver's license, and she is able to drive.  (Tr. 36).

- Plaintiff received her GED in 2009.  (Tr. 36, 229).

- Plaintiff previously worked as a restaurant manager, a part-time cook, and a grocery store cashier.  (Tr. 37-38).

- Plaintiff stopped working because she is "not able to deal with people very well."  (Tr. 40).

- There are days that Plaintiff cannot get out of bed, and she stays home unless she has to go to the grocery store or a doctor's appointment.  (Tr. 40-41).  This happens a few days a week.  On days where she does not get out of bed, Plaintiff does not get dressed or shower, and sometimes does not eat.  (Tr. 44-45).

9

- Plaintiff forgets to take her medications (Risperdal and Vistaril), and her aunt reminds her.  The medications do not relieve her symptoms, and Risperdal makes her feel hazy.  (Tr. 44).

- Risperdal and Vistaril are new medications because Plaintiff stopped taking medication for a while due to bad stomach issues.  (Tr. 45-46).

- Plaintiff hides in her room during family get-togethers, and she tends to yell a lot.  Plaintiff stays at home unless she has to go to the grocery store or a doctor's appointment.  (Tr. 41).

- When Plaintiff goes grocery shopping, she has to go outside and collect herself. (Tr. 43).  At the hearing, she felt hot and nauseated, and her heart was pounding. (Tr. 41).

- Plaintiff hears music in her head, which leads to problems concentrating.  She can read the same page ten times and not know what she read.  (Tr. 46). Plaintiff stated that she suffers from racing thoughts, and that the medications have not helped this.  (Tr. 47).

The VE testified Plaintiff had past work as a service manager.  (Tr. 51).   The ALJ then posed the following hypothetical question:

> [P]lease assume that the person is 37 years of age, with a GED, and the past work experience you just described.  Assume the person could perform no greater than light work as defined in the regulations, that they could frequently climb ramps or stairs, occasionally climb ladders, ropes, or scaffolds; that they could frequently balance, stoop, kneel, crouch, or crawl; that they must avoid even moderate exposure to the operational control of moving machinery, and unprotected heights; that they would be able to perform simple, routine and repetitive tasks in a work environment free of fast paced production requirements; involving only simple work related decisions; and they would need a job with only occasional decision making, and only occasional changes in the work setting; that they should have only occasional interaction with the public, coworkers, and supervisors; that they would be able to maintain attention and concentration for two hour segments over an eight hour period; and that they could complete a normal work week without excessive interruptions from psychologically based symptoms.

(Tr. 51).

The VE testified the hypothetical individual would not be able to perform Plaintiff's past work as a service manager.  (Tr. 52).  However, the VE further explained that the hypothetical individual would be able to perform other representative jobs in the economy, such as laundry sorter, a folder, or a mail clerk.  (Tr. 52).  The ALJ further testified that if the hypothetical person were off-task for 20% or more of the workday, or missed two or more days of work per month, there would be no job the person could do.  (Tr. 52).

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while he/she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923

11

(6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Plaintiff was insured on her alleged disability onset date, January 1, 2009 and remained insured through June 30, 2010, her DLI.  (Tr. 15). Therefore, in order to be entitled to POD and DIB, Plaintiff must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

12

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through June 30, 2010.

2.     The claimant has not engaged in substantial gainful activity since January 1, 2009, the alleged onset date.

3.     The claimant has the following severe impairments: fibromyalgia and bipolar disorder.

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of tone of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can frequently climb ramps or stairs, but only occasionally climb ladders, ropes, or scaffolds. She can frequently balance, stoop, kneel, crouch, or crawl. She must avoid even moderate exposure to the operational control of moving machinery and unprotected heights. The claimant is able to perform simple, routine, repetitive tasks in a work environment free of fast-paced production requirements involving only simple work-related decisions. She would need a job with only occasional decision making and only occasional changes in the work setting. She should have only occasional interaction with the public, coworkers, and supervisors. She is able to maintain attention and concentration for two-hour segments over an eight-hour period. Finally, the claimant is able to complete a normal workweek without excessive interruptions from psychologically or physically based symptoms.

6.     The claimant is unable to perform past relevant work.

7.     The claimant was born on May 8, 1977 and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.     The claimant has at least a high school education and is able to communicate in English.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports the

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2009, through the date of this decision.

(Tr. 15-24).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner

are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

15

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

Plaintiff maintains that the ALJ erred by failing to properly evaluate the opinion of Richard Woods, Plaintiff's treating counselor.  Upon review of the ALJ's decision and the record evidence, the Court disagrees for the following reasons.

A mental health counselor is not an "acceptable medical source" under the regulations. *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011).  Rather, a counselor is an "other source" pursuant to 20 C.F.R. §§ 404.1513(d) and 416.913(d),[3] which is not subject to the "good reasons" requirement of the treating physician rule.  *Id.*; *see also Pyotsia v. Astrue*, 2013 WL 101932 at * 6 (N.D. Ohio Jan. 8, 2013).  Nonetheless, according to Social Security Ruling ("SSR") No. 06–03p,[4] an ALJ must still consider opinions and findings from "other sources":

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity.  Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

[3]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (Mar. 27, 2017).

[4]     SSR 06-03p has been rescinded as to disability claims filed on or after March 27, 2017.  *See* 82 Fed. Reg 15,263 (Mar. 27, 2017).

16

*See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir.2007) (noting the ALJ should have

provided some basis as to why he was rejecting the opinion of an "other source"); *Hatfield v.*

*Astrue*, 2008 WL 2437673 (E.D. Tenn. Jun. 13, 2008) (noting that "[t]he Sixth Circuit ... appears

to interpret the phrase 'should explain' as indicative of strongly suggesting that the ALJ explain

the weight [given to an 'other source' opinion], as opposed to leaving the decision whether to

explain to the ALJ's discretion"); *Pyotsia*, 2013 WL 101932 at * 6.  Indeed, "[o]pinions from

these medical sources, who are not technically deemed 'acceptable medical sources' under our

rules, are important and should be evaluated on key issues such as impairment severity and

functional effects, along with other relevant evidence in the file."  SSR 06-03p, 2006 WL

2329939 at * 3.

When evaluating evidence from this type of "other source" the ALJ should consider:

"such factors as the nature and extent of the relationship between the source and the individual,

the source's qualifications, the source's area of specialty or expertise, the degree to which the

source presents relevant evidence to support his or her opinion, whether the opinion is consistent

with other evidence, and any other factors that tend to support or refute the evidence."  SSR 06-

03P, 2006 WL 2329939.

In this case, the ALJ summarized Mr. Woods's opinion in his written decision as follows:

Mr. Woods submitted a medical source statement in which he opined that due to the
claimant's anxiety and racing thoughts, she is able to understand, remember, and carry
out directions for simple tasks, but she can stay on task less than two-thirds of the time.
She is unable to perform at an average-paced job without a reduction in productivity of
greater than 20 percent compared to an unimpaired worker. Mr. Woods further opined
that the claimant will be absent, late or leave early from one to three times per month on a
regular and continuing basis.  She can tolerate the stress of routine unskilled or
low-skilled work only if she can take unscheduled breaks as much as 15 to 20 percent of
the day.  Finally, Mr. Woods opined that the claimant is unable to consistently interact

17

with the public, coworkers, or supervisors in an appropriate manner and would not be successful in working with the public, coworkers or supervisors.  (Ex. 22F).

(Tr. 21).

The ALJ noted that Mr. Woods's opinion should be evaluated as "other source" evidence pursuant to SSR 06-03p, and he assigned it "little weight," reasoning as follows:

> Although he is a treating therapist with a longitudinal perspective regarding the claimant's condition, his treatment notes do not support his opinion, and his opinion is not consistent with the record as a whole.  The claimant consistently was assessed with a GAF score of 60, which indicates moderate symptoms.  When she took her medications as prescribed, she reported stable mood, improved sleep, improved depression, and doing well overall.

*Id.*

This analysis, while brief, comports with the regulations and SSR 06-03p.  An ALJ need only provide discussion sufficient to ensure that the claimant and this Court can follow his reasoning.  Here, that has been accomplished.  The ALJ appropriately recognized that Mr. Woods had a longitudinal view of Plaintiff's condition.  However, as the ALJ noted, the various limitations to which Mr. Wood opined are not supported by his own treatment notes, and the Court's independent review of the record bears this out.

First, Plaintiff attended counseling sessions with Mr. Woods on five previous occasions, the last of which was nearly a year prior to his preparation of the medical source statement.  (Tr. 460-65, 567-70).  As noted by the Commissioner, the treatment notes do not show that Mr. Woods ever performed a mental status exam of Plaintiff.  Further, the treatment notes offer little that might otherwise reasonably support the claimed limitations.  For instance, the narrative description contained in the treatment note from May 2013 indicates that her counselor

> met with [Plaintiff] and tried the Toe Wiggle Induction to guide her into trance and the Cloud Script to deepen her trance.  She reported no effect from the attempt to hypnotize

18

her. We talked about using relaxation next time. She reported [ ] racing thoughts and sleeping better but only for a few hours, not a full night.

(Tr. 569). The note offers little of substance other than a notation that Plaintiff had "some improvement" in reaching her goal to "[d]ecrease targeted symptoms as evidenced by client's (parent's/guardian's) report." While, as Plaintiff points out, the treatment notes show that her progress shifted between "some improvement" to "deterioration" to "no change," they document little to nothing that would establish a baseline with respect to Plaintiff's impairment. Plaintiff fails to direct the Court's attention to anything in else contained in Mr. Woods's notes that could reasonably support his opinion. The Court has reviewed the remainder of the treatment notes and concludes they too are reasonably unsupportive of Mr. Woods's opinion.[5] Therefore, substantial evidence supports the ALJ's conclusion that the limitations to which Mr. Wood opined are unsupported by his own treatment notes.

In addition, the ALJ stated that Mr. Woods's opinion is inconsistent with the record as a whole, noting in particular that Plaintiff was consistently assessed with a GAF score of 60.

---

[5]     At least in relation to her mental impairment, the other treatment notes are similarly insubstantial. On January 17, 2013, Mr. Wood noted that he "[m]et with Amy and began to get to know her problems. She agreed to purchase the PTSD Workbook and to begin hypnosis next session." (Tr. 464). On February 1, 2013, he wrote: "met with Amy, and she only did the homework to page 15, because she didn't know the answers. She talked about seeing ghosts, and hearing music, that she never listened to. Then we worked on the questions she did not get to." (Tr. 462). On March 5, 2013, he wrote "met with Amy and we reviewed Chapter I. I taught Chapter II in the PTSD workbook. She has buried uncles in the last 2 and ½ weeks. Her aunt has surgery tomorrow, to have a total hysterectomy. They will have [ ] a cancer doctor there [] to see if there is cancer and rate it if there is cancer. She has to go in for a liver scan, a thyroid problem and to much hemoglobin in her blood. She is afraid of liver cancer." (Tr. 460). On March 26, 2013, he wrote: "met with Amy and she reported, she is having to change her aunt's bandage, once day. She is waiting[] for her disability hearing." (Tr. 567).

19

Review of the record shows that on August 30, 2011, March 28, 2013, April 26, 2013, May 30, 2013, July 1, 2013, August 6, 2013, October 21, 2013, Plaintiff was assessed with a GAF of 60, which indicates moderate symptoms.  (Tr. 458, 580, 583, 586, 589, 592, 596).  Plaintiff does not contest the ALJ's reliance on Plaintiff's GAF scores, and the Court concludes that in combination with other evidence on the record they reasonably support the Commissioner's decision.

Further, substantial evidence supports the ALJ's assertion that Plaintiff showed stability and overall improvement when Plaintiff was compliant with her medications.  For instance, on February 14, 2013, while she complained of grogginess during the day, Plaintiff reported that "she is doing well on Fanapt," "her mood is stable," "she has not been irritable with all the stress that has been going on in her life," "she is sleeping much better" and"she has slept better this past week than she has in years."  (Tr. 422).  On March 28, 2013, Plaintiff said "she is doing well," and that "she had not noticed a difference in her mood until she missed her last dose."  (Tr. 579). On April 26, 2013, Plaintiff again reported doing well and that she was mostly stable, despite mood swings and irritability, and that she "has less stress in her life."  (Tr. 582).  On October 21, 2013 and May 8, 2014, she reported similar improvements.  (Tr. 591, 698).

The Court rejects Plaintiff's assertion that the ALJ's evaluation of Mr. Woods's opinion should be deemed inadequate because the ALJ did not thoroughly address issues relating to Plaintiff's medications.  First, Plaintiff fails to provide a rule that would require an ALJ to consider medications and their side effects when assessing a treating counselor's opinion.  While Plaintiff notes that the regulations require consideration of medication side effects when evaluating pain, pursuant to 20 C.F.R. § 404.1529, this regulation relates to a claimant's

20

credibility, not to the manner in which "other source" opinions should be evaluated.  Here, Plaintiff does not raise a credibility argument.  As such, § 404.1529 is inapplicable here.

Further, assuming *arguendo* that the ALJ failed to adequately address the efficacy and side effects of Plaintiff's medications, this would have no bearing on the Court's determination that the ALJ properly evaluated Mr. Woods's opinion.  As already described, substantial evidence supports the ALJ's conclusion that Mr. Woods's opinion is not supported by his own treatment notes.  Further, Plaintiff does not raise the ALJ's alleged failure to fully assess the efficacy and side effects of Plaintiff's medication as an independent issue.  Rather, the only alleged error in this case arises from the ALJ's failure to properly evaluate Plaintiff's treating counselor.  Insofar as Plaintiff's submission might be interpreted otherwise, the court finds the argument waived.  *See United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir.1996) ("[issues] adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir.1997) ("[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.").

Finally, the ALJ's conclusion that Mr. Woods's opinion is inconsistent with the record is further supported by evidence of Plaintiff's activities of daily living.  As noted in the administrative decision, "[Plaintiff] is independent with personal care.  She is able to prepare meals, do laundry, clean the floors, go grocery shopping with others, play games on the computer and take care of her aunt who is confined to a wheelchair."  (Tr. 22).

In sum, the Court concludes that the ALJ did not err in evaluating the opinion of Plaintiff's treating counselor.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be AFFIRMED.


    *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: May 5, 2017

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)**